No. 23-80025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RASESH SHAH, ET AL.

v.

QUALCOMM INCORPORATED, ET AL.

_____

On Petition for Permission to Appeal from
the United States District Court for the Southern District of California
The Honorable Jinsook Ohta
Case No. 3:17-cv-00121-JO-MSB

# ANSWERING BRIEF IN OPPOSITION TO PETITION FOR PERMISSION TO APPEAL PURSUANT TO RULE 23(f) FROM AN ORDER GRANTING CLASS CERTIFICATION

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
JONATHAN D. USLANER
LAUREN M. CRUZ
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

MOTLEY RICE LLC
GREGG S. LEVIN
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9000

Additional counsel listed on
signature page

*Counsel for Plaintiffs-Respondents Sjunde AP-Fonden and Metzler
Asset Management GmbH, and Class Counsel for the Class*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Lead Plaintiffs Sjunde AP-Fonden and Metzler Asset Management GmbH are not corporations.

## **<u>TABLE OF CONTENTS</u>**

<u>**Page**</u>

CORPORATE DISCLOSURE STATEMENT ........................................................ i

I.   INTRODUCTION.................................................................................1

II.  STATEMENT OF THE ISSUE.............................................................3

III. STANDARD OF REVIEW ..................................................................3

IV.  PROCEDURAL HISTORY AND CLASS CERTIFICATION
     DECISION ..........................................................................................4

     A.   Overview of the Action .......................................................4

     B.   The District Court's Class Certification Decision ...............6

ARGUMENT .....................................................................................................8

I.   The District Court Did Not Commit "Manifest Error".....................8

II.  The Order Presents No Unsettled and Fundamental Issue of Law ..................16

III. The "Death Knell Doctrine" Is Inapplicable...................................18

IV.  The Chamber of Commerce's Amicus Brief Does Not Justify
     Interlocutory Review........................................................................18

CONCLUSION ................................................................................................19

# <u>TABLE OF AUTHORITIES</u>

Cases                                                                  Page(s)

*In re Apollo Grp., Inc. Sec. Litig.*,
  2010 WL 5927988 (9th Cir. June 23, 2010) .........................................................9

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) .........................................................................12, 17

*Chamberlan v. Ford Motor Co.*,
  402 F.3d 952 (9th Cir. 2005) ....................................................................*passim*

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)..................................................................................... 3, 7, 8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)......................................................................................... 14

*Goldman Sachs Group, Inc. v. Arkansas Teachers Retirement System*,
  141 S. Ct. 1951 (2021)........................................................................................7

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
  2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023)...............................................16

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) ......................................................................4, 11

*Lambert v. Nutraceutical Corp.*,
  870 F.3d 1170 (9th Cir. 2017) ......................................................................... 14

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ............................................................................11

*Ludlow v. BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015) ...............................................................15, 16, 18

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) ............................................................................14

Lead Plaintiffs-Respondents Sjunde AP-Fonden and Metzler Asset Management GmbH ("Plaintiffs") respectfully submit this Answer to Petitioners-Defendants' Petition under Federal Rule of Civil Procedure 23(f).

## I. INTRODUCTION

As night follows day, a district court certifies a securities class action, and defendants then ask the Circuit for interlocutory review. But Petitioners-Defendants' request here is without merit. The District Court's well-reasoned order applied controlling law to find, in its ample discretion, that common issues predominate and class certification is warranted.

Defendants try to manufacture an issue of "first impression" where none exists by basing their Petition on a fiction that the District Court relied on a "materialization of risk theory" of loss causation. It did not. Consistent with the Complaint, the evidence, and established law, the District Court credited Plaintiffs' "corrective disclosure theory" of loss causation and found that "reliance can be resolved on a class-wide basis." Order at 29-30.[1] Defendants cannot obtain interlocutory review of the District Court's Class Certification Order by trying to rewrite it.

---

[1] "Order" refers to the District Court's March 20, 2023 Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification (ECF No. 279). Except as otherwise noted, internal quotation marks and citations in quotations are omitted, and emphasis is supplied. References to "¶ __" refer to the Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("Complaint"), filed July 3, 2017 (ECF No. 32).

Nor are Defendants entitled to interlocutory review by suggesting that appellate outcomes in Qualcomm's antitrust cases occurring years after the end of the Class Period entitle them to a get-out-of-jail-free card in this securities action. Defendants led investors to believe they did not "bundle" the negotiations and sale of their cellular patent licenses and chipsets when, in fact, they did. That some—but not all—appellate courts many years later found that the plaintiffs in those cases did not demonstrate an antitrust violation is irrelevant to this securities action. Nor were those subsequent appellate decisions any consolation prize to Qualcomm's former shareholders, who lost billions of dollars years earlier, when the truth about the Company's undisclosed bundling practices was revealed and Qualcomm's stock price fell as a result. Additionally, just today, the top appellate court in Korea issued an order affirming the KFTC's biggest fine ever—a record $778.5 million—against Qualcomm stemming from its investigation at issue in this case concerning its "strategy where it ties the chipset purchases and license agreement."[2] If anything, the significance of these mixed, subsequent appellate decisions, at most, goes to the merits of Plaintiffs' claims—presenting common, class-wide issues that further support class certification and do not justify interlocutory review.

---

[2] Kwanwoo Jun, South Korea's Top Court Upholds Fine for Qualcomm, *Wall Street Journal* (Apr. 13, 2023); ECF No. 255-83 at 1428 (Ex. 87 at n.192).

Damages in this case can be calculated using the standard, "out-of-pocket" damages methodology proposed by Plaintiffs and their NERA financial expert, Dr. David Tabak.  This same methodology has been used in countless securities class actions and endorsed by dozens of courts in this Circuit and around the country as consistent with *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  If it is necessary to disaggregate investor losses caused by revelations unrelated to the "bundling" corrective disclosures or based on the likelihood of events occurring, Dr. Tabak's methodology can do so—as his expert reports explain.

Far from being clearly erroneous or involving unsettled questions of class-action law, the District Court's decision correctly applies controlling law. Defendants' Petition presents no issues worthy of interlocutory review and should be denied.

## II.  STATEMENT OF THE ISSUE

Whether the Court should grant interlocutory review of the District Court's class certification order, which applied this Court's settled law and the myriad decisions of other district courts in this Circuit to conclude that Plaintiffs' damages theory satisfies *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

## III.  STANDARD OF REVIEW

"[P]etitions for Rule 23(f) review should be granted sparingly" and are reserved for "rare occurrence[s]," because they "add to the heavy workload of the

appellate courts" and "undermine the district court's ability to manage the class action." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 955, 959 (9th Cir. 2005). To merit such extraordinary review, Defendants must demonstrate that:

> (1) there is a death-knell situation . . . that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable; (2) the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; or (3) the district court's class certification decision is manifestly erroneous.

*Id*.

The Court "review[s] a district court's decision to certify a class for abuse of discretion, and accord[s] the district court noticeably more deference when reviewing a grant of class certification than when reviewing a denial." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1115 (9th Cir. 2017).

## IV.  PROCEDURAL HISTORY AND CLASS CERTIFICATION DECISION

### A.  Overview of the Action

This is a securities class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, on behalf of persons or entities who purchased or otherwise acquired the common stock of Qualcomm between February 1, 2012 and January 20, 2017, and who were damaged thereby.

Qualcomm licenses cellular patents and also makes chipsets for cellular devices that employ its patented technology. For years, Qualcomm's top executives

assured investors that Qualcomm did not "bundle" the negotiations and terms of its patent license and chipset agreements, telling investors that they "do not enforce or insist on any kind of bundling," that license agreements "absolutely [] are done without QCT's [Qualcomm's chipset business] involvement," and "we don't bundle those together." ¶¶ 75-76. They also repeatedly told investors that, in accordance with the Company's commitment to the standard-setting bodies to license on a "FRAND" basis, Qualcomm did not "discriminate" between licensees based on whether they purchased Qualcomm's chipsets, assuring investors that the Company provided licenses "to interested companies on terms that are . . . free from unfair discrimination." *See, e.g.*, ¶¶ 138, 151, 181.

Defendants' statements were false, misleading, and omitted material facts. In truth, Qualcomm engaged in the very "bundling" practices it assured investors and the standard-setting bodies it shunned, providing massive "conditional rebates" to licensees if they purchased Qualcomm's chipsets. Qualcomm's bundling with Apple alone amounted to billions of dollars of license discounts in exchange for Apple exclusively buying chipsets from Qualcomm, instead of one of Qualcomm's competitors.

Investors learned the truth through four corrective disclosures—including revelations that Qualcomm had "extracted baseband processor exclusivity from Apple," its largest customer, in exchange for billions of dollars of "royalty relief."

In response to these disclosures, each of which revealed new information about Qualcomm's bundling practices, the Company's stock price plummeted and investors lost billions of dollars. *See* ECF Nos. 11-6, 11-7. The price of Qualcomm stock remained down for years while the Company sought appellate relief and its investors locked in their substantial losses.

On March 18, 2019, the Court denied Defendants' motion to dismiss. The Court emphasized that this is a securities class action, not an antitrust action: plaintiffs do not "seek to impose liability for Defendants' failure to accuse itself of [antitrust violations,]" but "[r]ather, the allegations claim Defendants' affirmative statements regarding their business practices of providing licenses in a non-discriminatory manner were false." ECF No. 59 at 7. Thus, the ultimate outcome of antitrust actions provides no relief to the investor class who suffered massive losses years ago.

### B. The District Court's Class Certification Decision

On May 23, 2022, Lead Plaintiffs filed their motion for class certification. ECF No. 217. In support, Plaintiffs submitted the expert report of Dr. Tabak, a highly experienced financial economist from NERA. ECF No. 217-2. Defendants opposed the motion, and the District Court held a two-hour hearing on the motion on October 19, 2022.

On March 20, 2023, the District Court issued a thorough 35-page opinion granting in part and denying in part Plaintiffs' motion for class certification. ECF No. 279. The District Court granted class certification with respect to Qualcomm's bundling misrepresentations, finding that Defendants failed to demonstrate a lack of price impact for those misrepresentations under *Goldman Sachs Group, Inc. v. Arkansas Teachers Retirement System*, 141 S. Ct. 1951 (2021).[3]

The District Court found that "the corrective disclosures contained information regarding bundling that was not publicly available prior to the corrective disclosures." Order at 29. Defendants failed to demonstrate that this corrective information was known to the market before the corrective disclosures and, therefore, failed to "sever the link between Defendants' alleged misrepresentations and their impact on the stock price." *Id.* at 30.

Finally, regarding damages, the District Court noted that Defendants "do not dispute that the event study Plaintiffs' expert proposes is a plausible method for measuring class-wide damages in a securities case such as this one." *Id.* at 31. After a thorough analysis, the District Court then found that Plaintiffs' proposed damages methodology was "sufficient under *Comcast* because the methodology can isolate

---

[3] The District Court found that Defendants demonstrated a lack of price impact with respect to chip "licensing misrepresentations" and, accordingly, denied class certification with respect to those statements after crediting Defendants' arguments. *See* Order at 22-28.

different categories of misrepresentations and measure the damages stemming from each." *Id.* at 32. The District Court specifically held that Dr. Tabak "can perform his disaggregation techniques as necessary pursuant to this opinion certifying only Plaintiffs' bundling allegations." *Id.* at 33 n.20.

## **ARGUMENT**

Defendants' Petition fails to present any of the three limited circumstances warranting immediate, interlocutory review under Rule 23(f). *See Chamberlan*, 402 F.3d at 959.

## I.   THE DISTRICT COURT DID NOT COMMIT "MANIFEST ERROR"

To warrant review under the "manifest error" standard, Defendants must identify a "truly manifest" error that is "easily ascertainable from the petition itself" and "virtually certain to be reversed on appeal from the final judgment." *Id.* at 959, 962. As discussed below, Defendants identify no error—let alone a "manifest error."

***First***, Defendants' Petition rests on a fiction that the Court applied Plaintiffs' "alternative" "materialization-of-the-risk theory"—and not a "corrective disclosure theory"—of loss causation. But the District Court analyzed this case entirely using a "corrective disclosure theory," with no need to rely upon any alternative loss causation theories.

As the District Court found, Qualcomm's stock price declined in direct response to four specific corrective disclosures, each of which revealed new facts to

investors. *See* Order at 29-30. Specifically, the Court concluded that each of "the corrective disclosures contained information regarding bundling that was not publicly available prior to the corrective disclosures." *Id*. at 29. The Court identified the specific "new information about the company's bundling practice" contained in each of them. *Id.* at 29-30. The Court further found that "Defendants have not pointed to evidence that this precise information was publicly available prior to the corrective disclosures." *Id.* at 30.

The District Court's finding that the four corrective disclosures revealed new information about Qualcomm's bundling practices is amply supported by the record. As detailed in the record before the District Court, each of the four corrective disclosures "provid[ed] additional or more authoritative fraud-related information that deflated the stock price." *In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010) (collecting cases). For example, while the first corrective disclosure stated that Qualcomm did not "properly negotiate" its license agreements under Korean law, the second indicated that Qualcomm "illegally paid a major [unidentified] customer for exclusively using Qualcomm chipsets," and that this practice violated European law. ¶¶ 94 n.48, 212, 216. The third corrective disclosure exposed for the first time that Qualcomm's bundling tactics extended to the United States, and that those bundling practices had a long-standing and pervasive impact on Qualcomm's largest customer, Apple. *See* ¶¶ 92-94, 224.

Finally, the fourth corrective disclosure—coming directly from Apple—revealed further alarming details regarding how Qualcomm enforced and kept hidden from investors its unprecedented bundling tactics with Apple, including a "gag order." *See* ¶¶ 111-15, 206, 228. Investors and analysts were stunned by these revelations about Qualcomm's secret and pervasive bundling practices, and its stock price dropped precipitously as a result. *See* ¶ 129.

***Second***, Defendants assert, based on their false say-so, that "the materialization-of-the-risk theory of liability" is the "only theory" of loss causation advanced by Plaintiffs in this case. Pet. at 18 n.8. As the above makes clear, that is not true. Throughout this litigation, Plaintiffs have principally relied upon a "corrective disclosure theory." The Complaint identifies each of the corrective disclosures, and Plaintiffs detailed in their motion for class certification how each of the corrective disclosures revealed new adverse information and caused investors' damages. ECF No. 217.

In this regard, Defendants grossly mischaracterize—and strip out of context—a single sentence from Plaintiffs' opposition to Defendants' previous motion for judgment on the pleadings. *See* Pet. at 18. Plaintiffs devoted 90% of that opposition brief to explaining their "corrective disclosure" loss causation theory. Plaintiffs detailed how "the alleged corrective disclosures each revealed new and important information related to Defendants' challenged statements that caused Qualcomm's

stock price to drop precipitously and foreseeably caused investors' losses." ECF No. 166 at 14-25. After extensively discussing their primary corrective disclosure theory, Plaintiffs argued "materialization of the risk" only (and explicitly) in the "alternative[]." *Id.* at 24-25. Plaintiffs have consistently advanced and primarily relied upon a "corrective disclosure theory" in this case.

Put simply, Defendants cannot manufacture an issue of "first impression" about the "materialization of risk theory" by latching onto a single sentence in Plaintiffs' brief in opposition to a different motion concerning an "alternative" theory of loss causation that the District Court did not adopt or rely upon in its Class Certification Order or anywhere else.

***Third***, Defendants wrongly contend that the District Court "parted ways" with precedent in concluding that Plaintiffs met their burden under *Comcast.* Pet. at 24-25. Not so. At this stage, Plaintiffs' burden under *Comcast* is to "show that damages are capable of measurement on a classwide basis, in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." *Just Film*, 847 F.3d at 1120. In other words, "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). The issue is whether "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated." *Id.*

In applying *Comcast*, the District Court correctly and carefully "consider[ed] whether Plaintiffs have proposed a plausible damages methodology that is linked to their liability case." Order at 31. The District Court found that they did. Plaintiffs' damages methodology utilizes an "out-of-pocket" damages method based on an "event study" of a stock trading market that Defendants here admitted was efficient. *See id.* at 20-21. As the District Court explained, "courts have consistently held that an event study is an appropriate method for measuring stock price inflation caused by alleged misrepresentations." *Id*. at 31 (citing cases).

Indeed, the District Court's determination was in accord with every court to have ever considered the issue in securities cases. For over 40 years, this Court and courts inside and outside this Circuit have endorsed the same "out-of-pocket" and "event-study" methodology to calculate damages in securities class actions. *See Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975) ("[O]ut of pocket loss is the ordinary standard in a 10b-5 suit," and in such cases "[e]very class member shares an overriding common interest in establishing the existence and materiality of misrepresentations.").

**Fourth**, Defendants mischaracterize Dr. Tabak's industry-standard damages analysis as "assum[ing] away" the need to disaggregate. Pet. at 25. But the District Court expressly and correctly found that Dr. Tabak's damages methodology can—and will—"disaggregate" any non-fraud-related factors that caused investor losses.

Order at 32. Specifically, the Court found that Dr. Tabak's damage methodology "estimate[s] 'the amount of artificial inflation in the market price at issue and calculate[s] how much of that inflation is due to the alleged fraud, as opposed to other factors.'" *Id.* The Court further explained that this methodology "can isolate different categories of misrepresentations and measure the damages stemming from each" (*id.*), and Dr. Tabak can "perform his disaggregation techniques as necessary pursuant to this [Order] . . . ." (*id.* at 33 n.20).

The District Court's findings are supported by the evidentiary record. In his expert reports, Dr. Tabak specifically described how he would calculate damages in this action, including disaggregating any non-fraud losses from those caused by the fraud:

> In quantifying damages, it will be necessary to review the alleged corrective disclosures to determine whether any of the information disclosed on the Event Dates related to practices unrelated to the allegations. If so, the effects of such practices on Qualcomm's stock price would be removed.

Opening Report (ECF No. 217-2) at ¶ 62. Dr. Tabak further explained that "[s]uch analyses are routinely performed by valuations of different business practices and/or reviews of analyst reports to determine the relative importance of different aspects of an alleged corrective disclosure." *Id.* at 30 n.50; *see also* Reply Report (ECF No. 255-2) at ¶ 63 (discussing "standard techniques for disaggregating the effect of different components of news disclosures"). Dr. Tabak also detailed how his

industry-standard damages model can account for risk perceptions and resulting price-inflation amounts over time by "adjust[ing] the measure of inflation accordingly, just as I have done in previous cases." Reply Report ¶¶ 71-72.

*Fifth*, Defendants' "materialization of the risk" arguments rely on the argument that the regulatory actions brought around the world against Qualcomm were not "inevitable" (i.e., not 100% likely to occur). Pet. at 25-28. At most, this is a premature dispute regarding the amount of damages Plaintiffs may seek at trial. *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th Cir. 2015) ("[T]he mere fact that there might be differences in damages calculations is not sufficient to defeat class certification."); *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) ("We have repeatedly emphasized that uncertain damages calculations should not defeat certification."), *rev'd on other grounds*, 203 139 S. Ct. 710 (2019); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811-12 (2011) ("*Halliburton I*") (loss causation issues inappropriate for determination at class certification).

To the extent it is necessary to disaggregate investor losses based on the likelihood of enforcement actions occurring, Dr. Tabak can (and will) do so, as he amply explained in his expert reports and at his deposition. In fact, the Petition itself acknowledges that an alternative stock-price inflation amount could be calculated in a class-wide manner, even if the enforcement actions were not "inevitable." *See* Pet.

at 20-21. As Defendants explain, if hypothetical Company A concealed the entirety of the regulatory risk it was facing, then its value would be inflated by $200,000, but if "Company A disclosed [] <u>half</u> of the regulatory risk it was facing," its value would "be inflated by $100,000"—or half as much. *Id.* at 20. Notably, this is a class-wide analysis that merely depends on what the finder of fact determines about the amount of the risk that was not disclosed to the market. Dr. Tabak can perform such a disaggregation calculation, if necessary—as the District Court specifically recognized in its Order. *See* Order at 33 n.20 (Dr. Tabak "can perform his aggregation techniques as necessary pursuant to this opinion").

***Finally***, Defendants' cited authorities do not demonstrate any "manifest error." For instance, Defendants rely on *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015), which involves proposed classes of BP investors before and after an oil spill and supports certification here. There, unlike here, plaintiffs and the district court relied exclusively on a "materialization of the risk theory"—<u>not</u> a "corrective disclosures" theory—for the pre-spill class, for which the circuit affirmed denial of certification. *Id.* at 688-90. As pertinent here, the circuit also <u>affirmed the certification</u> of the post-spill class, which relied—as Plaintiffs do here—on a "corrective disclosures" theory. *Id.* at 688. In so doing, the circuit emphasized that arguments about the link between alleged corrective events and prior misrepresentations, loss causation, and detailed damages calculations are

inappropriate at class certification under *Halliburton I*. *See Ludlow*, 800 F.3d at 687-88. As the *Ludlow* court held, plaintiffs satisfy *Comcast* if they propose a methodology that "allows for the removal of corrective events later found to not 'correct' the misrepresentations." *Id*. at 689. "The *ability* to do so, not the actual execution of that correction, is what *Comcast* requires at this stage." *Id.*[4]

## II. THE ORDER PRESENTS NO UNSETTLED AND FUNDAMENTAL ISSUE OF LAW

Defendants also contend (Pet. at 16-17) that the Order "presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review." *Chamberlan*, 402 F.3d at 959. This Court has expressed "concern" that construing this standard too broadly "would foster too many fruitless Rule 23(f) applications because a creative lawyer almost always will be able to argue that deciding her case would clarify some 'fundamental' issue." *Id.* at 958. This Court therefore restricts Rule 23(f) review to "novel legal issues" that are "likely to evade effective review

---

[4] Defendants also cite *Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, *1 (M.D. Tenn. Feb. 24, 2023), which also supports certification here. Like *Ludlow*, *AAC* involved two separate claims, a marketing claim based on "materialization of the risk," which the court did not certify because "[p]laintiff's expert report as to calculation of damages . . . omit[ted] any consideration of how to factor in the risk on which [p]laintiff bases its materialization-of-the-risk theory," *id.* at *24, and a restatement claim "based on a corrective disclosure theory of loss causation, rather than a materialization-of-the-risk theory," which the court certified because plaintiff's "method for calculating damages seem[ed] clearly geared toward a corrective disclosure theory of loss causation," *id.* at *25.

after the completion of the case." *Id.* Here, Defendants' assertion fails for several reasons.

**First**, the supposed unsettled issue of law is based on a mischaracterization of the Order. The District Court's decision did not address—and did not need to address—a "materialization of the risk" theory of loss causation or damages. The Court correctly analyzed, and found that Plaintiffs demonstrated, loss causation through four corrective disclosures.

**Second**, there is nothing "unsettled" about the fact that the "out-of-pocket" method is the standard method of measuring damages in securities class actions, or that it is well suited to this case—whether or not disaggregation is required. *See* pages 11-14, *supra*; *see also Blackie*, 524 F.2d at 905.

**Third**, the merits issues that Defendants raise are not issues "likely to evade end-of-the-case review." *Chamberlan*, 402 F.3d at 959. The quantification of damages on a fully developed factual record will be addressed in expert reports, on summary judgment, and at trial. If Defendants are able to show at an appropriate later stage of the litigation that Plaintiffs' loss-causation and damages theories are faulty, they may raise those arguments with the District Court, as the District Court expressly acknowledged (*see* Order at 33 n.20). Additionally, Rule 23 permits the District Court to revisit class certification at any time.

## III. THE "DEATH KNELL DOCTRINE" IS INAPPLICABLE

Defendants' Petition does not assert that this action satisfies this Court's "death knell" standard for interlocutory review of class certification orders. *See Chamberlan*, 402 F.3d at 957. That is not surprising since Qualcomm is a multibillion-dollar corporation with vast resources. It has ample resources to litigate this case and compensate investors who purchased its securities at artificially inflated prices during the Class Period.

## IV. THE CHAMBER OF COMMERCE'S AMICUS BRIEF DOES NOT JUSTIFY INTERLOCUTORY REVIEW

The Chamber of Commerce's amicus brief provides no sound basis for interlocutory review. After repeating Defendants' arguments, the Chamber makes two baseless arguments.

*First*, the question whether to adopt the materialization-of-the-risk theory is not properly presented here, because the District Court did not adopt it. Moreover, the Chamber misstates the holding in *Ludlow*, which denied certification of the pre-spill class only because plaintiff's pre-spill class damages theory improperly assumed investors would not have bought BP stock at all if the risk had been disclosed. *See Ludlow*, 800 F.3d at 680, 690. Thus, the *Ludlow* plaintiff's model required individualized assessments of each investor's risk toleration. *See id.* at 690-91. *Ludlow* expressly did not hold that materialization of the risk is never a valid damages theory. *See id.* at 689-90 & n.68.

*Second*, the Chamber's "death knell" argument deserves no weight because it was not raised by Qualcomm, which can afford to litigate this case and is under no undue pressure to settle. Coming from the Chamber, this is an irrelevant, political argument.

## **CONCLUSION**

Plaintiffs respectfully submit that Defendants' Petition should be denied.

Dated: April 13, 2023

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner
jonathanu@blbglaw.com
Lauren M. Cruz
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

-and-

Salvatore J. Graziano
salvatore@blbglaw.com
Rebecca E. Boon
rebecca.boon@blbglaw.com
Jai K. Chandrasekhar
jai@blbglaw.com
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

**MOTLEY RICE LLC**
Gregg S. Levin
glevin@motleyrice.com
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9000
Fax: (843) 216-9450

*Counsel for Lead Plaintiffs Sjunde AP-Fonden and Metzler Asset Management GmbH, and Class Counsel for the Class*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** ___23-80025_____

I am the attorney or self-represented party.

**This brief contains** __4,174__ **words,** including _0__ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**: _/s/ Jonathan D. Uslaner____ **Date**: 4/13/23_____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court for the Ninth Circuit Court of Appeals by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner